**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMAR M. COOK,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 24-CV-0314** |
| | : | |
| **BLANCHE CARNEY,** *et al.* | : | |
| **Defendants.** | : | |

**MEMORANDUM**

YOUNGE, J.                                                                                    JUNE 26, 2024

      Currently before the Court is an Amended Complaint filed by Plaintiff Jamar M. Cook, who is currently incarcerated at SCI Somerset.  Cook raises several claims based on conditions to which he was subjected when he was a pretrial detainee incarcerated within the Philadelphia Prison System, with a focus on allegations that he was attacked twice by the same inmate.  For the following reasons, the Court will dismiss the Amended Complaint in part.  Cook will be given the option of filing a second amended complaint or proceeding at this time on his remaining, well-pled claims.

## I.   FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

      Cook initiated this civil action by filing a Complaint pursuant to 42 U.S.C. § 1983 against Blanche Carney (the former Commissioner of the Philadelphia Prison System), Michell Farrell (identified in the Complaint as Warden of the Riverside Correctional Facility) and two John Doe Correctional Officers employed at the Riverside Correctional Facility ("RCF").   (Compl, ECF No. 2.)  Cook alleged that the Defendants violated his constitutional rights by failing to take action to protect him from an attack by an inmate with whom he had a history, which occurred on January 20, 2022.  (*Id.* at 2.)  In an April 12, 2024 Order, the Court granted Cook leave to

proceed *in forma pauperis* and directed Cook to complete paperwork (USM-285 forms) so that the Court could direct service of his Complaint by the United States Marshal Service.  (ECF No. 13.)  In doing so, the Court recognized that, although service could not be made upon the John Doe Correctional Officers without sufficient identifying information, the supervisory officials could be served in hopes of later identifying the staff who were more directly involved in the events giving rise to Cook's claims.  (*Id.*)

Cook returned with completed USM-285 forms for Defendants Carney and Farrell.  (ECF No. 15.)  At the same time, he filed an Amended Complaint, which added additional claims against additional defendants based on the January 20, 2022 incident at RCF and events pre-dating that incident when Cook was incarcerated at the Philadelphia Industrial Correctional Center ("PICC").  (Am. Compl., ECF No. 14.); *see* Fed. R. Civ. P. 15(a) (permitting a party to "amend its pleading once as a matter of course" in the early stages of a case).  "[A]n amended pleading supersedes the original pleading and renders the original pleading a nullity." *Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019).  In other words, "the most recently filed amended complaint becomes the operative pleading."  *Id.*  This means Cook's claims are now governed solely by the factual allegations in the Amended Complaint.

In his Amended Complaint, Cook named the following Defendants in their individual and official capacities:  (1) Carney; (2) Farrell, now identified as Warden of PICC during the relevant time period; (3) Cathy Talmadge, identified as Warden of RCF during the relevant time period; (4) C.O. 4 Dunkin, identified as a Hearing Examiner at PICC; (5) C.O. 1 MacCallister, identified as a Correctional Officer at PICC; (6) Corizon Health, the medical service provider for the Philadelphia Prison System during the relevant time period; (7) John Doe #1, a grievance officer at PICC; (8) John Doe #2, a grievance officer at RCF; (9) John Doe #3, a Correctional Officer at

RCF; (10) John Doe # 4, another Correctional Officer at RCF; (11) John Doe #5 a Medical Supervisor at PICC; and (12) John Doe #6, a nurse at PICC. (Am. Compl. ¶¶ 4-16.)

Cook alleges that, upon his admission to PICC as a pretrial detainee in October 2020, he observed that inmates at the facility could "easily breach their cell doors," allowing them to "exit or enter their cells at will" and "violently assault other inmates." (*Id.* ¶¶ 17-18.) He contends that Carney and Farrell nevertheless "continued to house dangerous, violent offenders with non-violent offenders without fully addressing the ability and propensity for inmates to breach their cell doors to engage in assaults on inmates and staff." (*Id.* ¶ 18.) On November 25, 2020, at least four inmates approached Cook and his cell mate in the presence of Defendant MacCallister. (*Id.* ¶ 19.) After the leader of the group of inmates "antagonized" Cook's cell mate for having confronted an inmate who allegedly supplied the block with contraband, several of the inmates attacked Cook's cell mate while one of the inmates attacked Cook. (*Id.* ¶ 20.)

Cook alleges that several other inmates "managed to 'pop out'" of their cells to join in the assault, such that ten or more inmates ultimately participated in the attack on Cook and his cell mate. (*Id.* ¶¶ 21, 25.) Cook claims that MacCallister orchestrated the attack because the cell mate's conduct was interfering with the ability of officers on the block (presumably including MacCallister) to profit from supplying contraband. (*Id.* ¶¶ 22-23.) Although MacCallister was allegedly present at the time of the attack, he "did nothing to prevent [it], such as order the inmates to disperse, deploy pepper-pray, and/or immediately radio for emergency response assistance." (*Id.* ¶¶ 24-25.) Cook contends that McCallister finally called for assistance when "the confrontation that he orchestrated exceeded his control," and that the incident resolved once additional officers responded. (*Id.* ¶¶ 25-26.)

Thereafter, several inmates including Cook were "written up" and placed in the Restricted Housing Unit ("RHU") pending a disciplinary hearing.  (*Id.* ¶ 27.)  Cook alleges that he never received notice of the disciplinary infractions with which he was charged and that, when he requested dismissal of the charges on that basis, Defendant Hearing Examiner Dunkin responded "you can take this forty-five days now or I can get you a copy [of the charges] . . . you won't like my mood . . . ."  (*Id.* ¶¶ 27-29.)  Cook accepted the discipline because he feared retaliation.  (*Id.* ¶ 29.)  He then appealed the sanction, filed a grievance, and took other actions in protest, including posting notices on his cell door directed to Carney and Farrell.  (*Id.* ¶¶ 31-32.)  Carney and Farrell, however, did not investigate Cook's complaints or "take other corrective measures" even though, according to Cook, they "had direct knowledge" of them.  (*Id.* ¶ 32.)

While serving his disciplinary sentence in the RHU, Cook did not have access to phone calls or video visits and was placed in full restraints during recreation.  (*Id.* ¶ 34.)  Upon completion of his sentence, Cook remained in the RHU for administrative custody purposes until he was transferred to the RHU at the Philadelphia Detention Center in February 2021.  (*Id.* ¶ 35.)  Cook claims that inmates were able to "easily breach their cell doors" at this facility as well, and that after he wrote to Carney, RHU officers "chain locked adjacent cell doors with one another" but removed the chains hours later because inmates complained.  (*Id.* ¶¶ 36-37.)

In June 2021, Cook was transferred to the RHU at RCF, where he contends inmates' ability to "pop out" of their cells was "more rampant than he had ever witnessed at PICC and DC combined" because the locks could be manipulated with a thin piece of paper or plastic.  (*Id.* ¶ 38.)  Cook contends that Carney and Talmadge "were aware of this rampant and serious security breach which resulted in numerous violent assaults against inmates and even staff" but that "neither routine security/maintenance checks nor cell checks were conducted even immediately

after a violent attack." (*Id.* ¶¶ 39, 41.)  Cook also noticed that some inmates on the unit displayed "jail-made knives, some of which were very large and could not be easily acquired or concealed except for a lackadaisical approac[h] and/or gross disregard for security . . . ." (*Id.* ¶ 40.)  He appears to attribute these issues to Carney, Farrell and Talmadge's "fail[ure] to implement and/or enforce any noticeable and necessary security protocols or better training, and, instead . . . facilitat[ing] a culture of lackadaisical concern and/or approach to security, tantamount to a 'let them kill each other' disposition." (*Id.* ¶ 42.)

On January 19, 2022, when Cook was housed on E-Unit at RCF, he noticed that several new inmates were placed on the unit, one of whom was the inmate who previously attacked him at PICC. (*Id.* ¶ 43.)  Cook informed Defendant Correctional Officer John Doe #3 that he was supposed to be kept separate from the inmate due to their prior history, to which John Doe #3 responded "oh you're Cook. . . you came here from PICC . . . you like being a little snitch-bitch . . . writing grievances . . . write your grievance . . . ." (*Id.* ¶ 45.)  The officer also refused Cook's request to see a supervising officer. (*Id.*)  The next day, on the 7am to 3pm shift, Cook approached Correctional Officer John Doe #4 and asked to see a supervising officer because he "had a separation from someone on the unit" and wanted to be moved. (*Id.* ¶ 46.)  Doe #4 declined to contact a supervisor, "mocked" Cook for "bitching," and told Cook he would have to file a grievance. (*Id.*)  Cook made the same request of Doe #3 on the next shift but was mocked for filing grievances. (*Id.* ¶ 47.)

Shortly thereafter, the inmate who previously attacked Cook attacked him from behind with a "large jail-made knife" while calling him a "faggot-ass rat." (*Id.* ¶ 48.)  Cook attributes this assault in part to alleged collusion among Does #3 and #4 and other officers to expose his bisexuality and his efforts to address "illegal contraband operations," to make him "a target for

violence, abuse and retaliation." (*Id.* ¶¶ 50-51.) Cook required fifteen staples to his head to close his wounds. (*Id.* ¶ 49.) He sustained permanent scars, trauma, and other injuries including flashbacks, nightmares, headaches, memory lapses, and phantom pain. (*Id.*)

Cook alleges that after medical staff at RCF treated his stab wounds, he was immediately transferred to the protective custody unit at PICC, "where he was placed in an extremely cold cell without a blanket and without working lights" for several days. (*Id.* ¶ 52.) He claims that, although he was told by medical staff that he would be seen daily for follow up medical care, including changing his bandages, his bandages were not changed until at least a week later. (*Id.* ¶ 53.) Cook complained to the nurse (presumably nurse John Doe #6) who distributed medication on the unit about his need for new bandages, but although she said she would return to treat him, she did not, leaving Cook to change his blood-soaked bandages himself. (*Id.* ¶¶ 54-55.) Cook alleges that he "endure[d] severe pain and suffering as the bandages stuck to [his] wounds." (*Id.*)

Cook filed a grievance "regarding his attack, failure to protect, cell conditions and medical malpractice" within two weeks of the incident. (*Id.* ¶ 56.) He claims, however, that he never received a response to any of the relevant grievances he filed and that he filed his final grievance and appeal on May 6, 2022. (*Id.* ¶ 59.) Cook believes Defendants Carney, Farrell and Talmadge were "aware" of his various grievances, requests and letters and simply disregarded them. (*Id.* ¶ 60.) He also believes that Does #1 and #2, the grievance officers at PICC and/or RCF, "intercepted, divulged and/or destroyed [his] grievances submissions and related correspondence" to interfere with his constitutional rights. (*Id.* ¶ 61.) Unrelatedly, Cook alleges that prison officials regularly reviewed inmates on protective custody for possible release to general population and that, although he requested to be transferred to general population at

another prison, he remained in protective custody until his release on May 12, 2022, although it is not clear whom he alleges is responsible for this placement and the failure to transfer him. (*Id.* ¶ 57.)

Based on the above allegations, Cook brings assorted constitutional claims pursuant to 42 U.S.C. § 1983, other federal claims, and certain related claims under state law. Cook primarily seeks damages.[1] (*Id.* ¶¶ 75-79.)

## II.   STANDARD OF REVIEW

Since Cook is proceeding *in forma pauperis*, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Amended Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Talley v. Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021). "At this early stage of the litigation,' '[the Court will] accept the facts alleged in [the *pro se*] complaint as true,' 'draw[] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, . . . contains facts sufficient to state a plausible [] claim.'" *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (quoting

---

[1] Cook also seeks a declaration that his rights have been violated. (Am. Compl. ¶ 74.) However, declaratory relief is unavailable to adjudicate past conduct, so Cook's request for this declaratory relief is improper. *See Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another."); *see also Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (*per curiam*) ("Declaratory judgments are meant to define the legal rights and obligations of the parties in the anticipation of some future conduct.").

*Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015)).  Conclusory allegations do not

suffice.  *Iqbal*, 556 U.S. at 678.  As Cook is proceeding *pro se*, the Court construes his

allegations liberally.  *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay*

*Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).

## III.   DISCUSSION

### A.  Improper Claims

The Amended Complaint invokes 42 U.S.C. §§ 1981, 1985, 1986 and 1988 and the

Pennsylvania Constitution as a basis for some of Cook's claims.  Since Cook has sued state

actors, § 1983 rather than § 1981 governs his claims, meaning there is no plausible basis for a §

1981 claim here.  *See McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir. 2009)

(explaining that § 1983 provides "the exclusive remedy for violations of § 1981 by state actors");

*see also Goodall-Gaillard v. N.J. Dep't of Corr.*, 625 F. App'x 123, 128 (3d Cir. 2015) ("[A]s

the District Court properly noted, § 1981 does not provide a private right of action against state

actors.").  Sections § 1985(3) and § 1986 are also inapplicable here because nothing in Cook's

allegations suggest that he was the target of racial or class based discriminatory animus designed

to deprive him of the equal protection of the laws, as would be necessary to proceed on a claim

under those provisions.  *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) ("[T]he reach of

section 1985(3) is limited to private conspiracies predicated on racial, or perhaps otherwise class

based, invidiously discriminatory animus." (internal quotations omitted)); *Clark v. Clabaugh*, 20

F.3d 1290, 1295 (3d Cir. 1994) ("[Section] 1986 constitutes an additional safeguard for those

rights protected under 42 U.S.C. § 1985, and 'transgressions of § 1986 by definition depend on a

preexisting violation of § 1985.'" (quoting *Rogin v. Bensalem Twp.*, 616 F.2d 680, 696 (3d Cir.

1980)); *see also Rose v. Guanowsky*, No. 21-3280, 2022 WL 910341, at *1 (3d Cir. Mar. 29,

2022) (affirming dismissal of § 1985(3) and § 1986 claims where plaintiff pled only conclusory allegations that were unsupported by any details within the complaint).  Nor has Cook pled sufficient facts to support the existence of a conspiracy against him.[2]  *See Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) ("[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred."); *see also Adger v. Coupe*, No. 21-1841, 2022 WL 777196, at *4 (3d Cir. Mar. 14, 2022) (allegations that "all defendants conspired to conceal their identities and hide abuse they inflicted on inmates" did not state conspiracy claim).  Additionally, neither § 1988 nor the Pennsylvania Constitution provide an independent basis for a damages claim.  *See Moor v. Alameda Cnty.*, 411 U.S. 693, 703-04 (1973) (explaining that § 1988 does not provide a basis for a claim but instead complements other civil rights statutes); *Karupaiyan v. Singh*, No. 21-3163, 2022 WL 6634603, at *1 (3d Cir. Mar. 1, 2022) (citing *Moor*); *see also Plouffe v. Cevallos*, 777 F. App'x 594, 601 (3d Cir. 2019) ("[N]or is there a private right of action for damages under the Pennsylvania Constitution"); *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011) ("No Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution.").  Accordingly, the Court will dismiss any claims under 42 U.S.C. §§ 1981, 1985, 1986 and 1988, any conspiracy claims, and any claims under the Pennsylvania Constitution because Cook has improperly relied on these inapplicable legal provisions and theories as a basis for his legal claims.

---

[2] This conclusion is also fatal to any conspiracy claims based on § 1983.

**B.  Section 1983 Claims**[3]

Most of Cook's claims are premised on § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  In a § 1983 action, the personal involvement of each defendant in the alleged constitutional violation is a required element, and, therefore, a plaintiff must allege how each defendant was involved in the events and occurrences giving rise to the claims.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).  The Court will discuss Cook's claims against the Defendants in turn.

**1.  Claims Against MacCallister and John Does #3 and #4**

Cook's claims against MacCallister and John Does #3 and #4 rest on allegations that these correctional officers incited violence against Cook, turned a blind eye to violence against him, or failed to intervene when he was attacked by another inmate.  Since Cook was a pretrial detainee when the underlying incidents occurred, his claims are governed by the Due Process Clause of the Fourteenth Amendment.  *Hubbard v. Taylor*, 399 F.3d 150, 165-66 (3d Cir. 2005) (holding that the Due Process Clause of the Fourteenth Amendment governs claims brought by pretrial detainees).  The rights afforded pretrial detainees under the Due Process Clause are at

---

[3] When reciting his claims, Cook invokes several constitutional provisions he believes were violated by each of the Defendant's actions and inactions.  Many of the amendments to which he refers simply do not apply.  Accordingly, the Court has focused its analysis of Cook's constitutional claims on the most applicable constitutional provisions that could give rise to a claim based on the events described in the Amended Complaint.  *See Holley v. Dep't of Veteran Affairs*, 165 F.3d 244, 248 (3d Cir. 1999) ("We apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name.").  To the extent the Amended Complaint refers to other constitutional provisions Cook believes have been violated, those provisions do not provide grounds for additional claims based on the facts alleged, and will not be discussed further.  The same is true for any state law claims not specifically discussed in this Memorandum.

least as great as those afforded by the Eighth Amendment. *See Simmons v. City of Philadelphia*, 947 F.2d 1042, 1067 (3d Cir. 1991). Therefore, courts analyzing cases by pretrial detainees apply the same standard of deliberate indifference applied to the Eighth Amendment cases. *Id.*

Prison officials have a duty "'to protect prisoners from violence at the hands of other prisoners.'" *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. To state a plausible failure to protect claim, Cook must allege that the conditions in which he was incarcerated posed a substantial risk of serious harm, and that prison officials acted with deliberate indifference to that substantial risk of serious harm. *See id.*; *Hamilton*, 117 F.3d at 746; *see also Burton v. Kindle*, 401 F. App'x 635, 638 (3d Cir. 2010) (applying deliberate indifference standard to failure to protect claim asserted by pretrial detainee).

Deliberate indifference is a subjective standard. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001). For his claim to be plausible, Cook must allege that the prison officials "knew or were aware of and disregarded an excessive risk to [his] health or safety." *Id.* at 135. "[I]t is not sufficient that the official should have been aware" of the excessive risk. *Id.* at 125. A prison officer's failure to intervene may also serve as a basis for liability under § 1983 if the officer "had a reasonable opportunity to intervene and simply refused to do so." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). "However, an officer is only liable if there is a realistic and reasonable opportunity to intervene." *Id.* at 651.

Cook alleges that MacCallister was present on November 25, 2020 when the group of inmates approached Cook and his then cell mate about the cell mate's challenge to an alleged

11

contraband ring operating on the unit, and that MacCallister delayed taking action in response to the "verbal confrontation and ensuing attack." (Am. Compl. ¶ 24.) More specifically, Cook claims that MacCallister "did nothing to prevent the attack, such as order the inmates to disperse, deploy pepper-spray, and/or immediately radio for emergency response assistance," and that, to the contrary, he did not call for assistance until after additional inmates had "popped out" of their cells and joined the melee. (Id. ¶¶ 21, 24-26.) Cook also alleges that MacCallister orchestrated the attack because he was among the officers who allegedly profited from distributing contraband to inmates. (Id. ¶ 23.) Taken together, these allegations support an inference that MacCallister was in a position to observe the escalating confrontation and, considering there was allegedly time for inmates to exit their cells and join the fight, had an opportunity to take action but delayed doing so, allegedly motivated by his involvement in the illicit contraband activities. These allegations provide a sufficient basis for Cook to proceed on his deliberate indifference claims against MacCallister because when taken as true, they support an inference that, at a minimum, MacCallister had an opportunity to intervene in the attack on Cook but declined to do so and that, at worst, MacCallister planned the attack and intended for the harm to occur. *See Bistrian v. Levi*, 696 F.3d 352, 371 (3d Cir. 2012) ("[I]f an officer witnesses an inmate assault and fails to intervene, 'his actions would seemingly constitute a paradigm case of deliberate indifference'" (quoting *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008))), *abrogation on other grounds recognized by Mack v. Yost*, 968 F.3d 311, 319 n.7 (3d Cir. 2020); *Smolen v. Brown*, No. 18-7621, 2023 WL 6199094, at *9 (S.D.N.Y. Sept. 22, 2023) ("Intentionally exposing an inmate to the risk of harm with no penological purpose is indicative of deliberate indifference to the inmate's safety at best and manifests an intent to harm the inmate at worst, thus constituting cruel and unusual punishment in violation of the Eighth Amendment to the U.S.

Constitution." (internal quotations and alterations omitted)); *Kornegey v. City of Philadelphia*, 299 F. Supp. 3d 675, 681 (E.D. Pa. 2018) (plaintiff could proceed to discovery on failure to intervene claim when he alleged that "officers were present when Tumblin assaulted Plaintiff and failed to intervene to stop the assault").  The Court will also permit Cook to proceed at this time on his related claim of intentional infliction of emotional distress against MacCallister, (*see* Am. Compl. ¶ 63), because Cook's allegations taken as true support an inference of outrageous conduct.  *See Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 826-27 (E.D. Pa. 2017) ("To establish an IIED claim under Pennsylvania law, a plaintiff must show that (1) the defendant's conduct was extreme or outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the plaintiff's distress is severe."); *Farrell v. Northampton Cnty.*, No. 11-3665, 2015 WL 4611298, at *9 (E.D. Pa. Aug. 3, 2015) ("Farrell has presented evidence from which a factfinder could reasonably conclude that defendant Kelly, a corrections officer with a duty to protect Farrell, conspired with defendant-prisoner Serrano to attack Farrell. The Court determines that this conduct is sufficiently outrageous to support Farrell's IIED claim.").

Cook has also stated failure to protect claims against John Does #3 and #4 as to the January 20, 2022 assault at RCF.  Cook alleges that he had previously been assaulted by the inmate who attacked him on that date, that he had been held in protective custody and had a separation order from that inmate, and that he informed Does #3 and #4 of his concerns shortly after the inmate arrived on the unit and only days and/or hours before the inmate attacked him with a knife.  (Am. Compl. ¶¶ 43, 45-46, 48.)  Both Doe Defendants allegedly failed to take any action in response to Cook's concerns and, instead, mocked Cook for "being a little snitch-bitch," "bitching," and filing grievances.  (*Id.* ¶¶ 45-46.)  Does #3 and #4 also allegedly exposed

the fact that Cook was bisexual and his efforts to address "illegal contraband operations" to make him "a target for violence, abuse and retaliation," which correlates with Cook's allegation that the inmate who attacked him called him a "faggot-ass rat."  (*Id.* ¶¶ 48, 50-51.)   These allegations, when taken as true, support an inference that Does #3 and #4 were deliberately indifferent to Cook's safety by failing to protect him from the inmate who attacked him and by sharing information that risked making Cook a target of assault.  *See Moore v. Mann*, 823 F. App'x 92, 94 (3d Cir. 2020) (*per curiam*) (vacating grant of summary judgment on claims that "corrections defendants allegedly began making inflammatory statements about Moore, calling him a pedophile, gay, and a snitch" creating a risk that Moore would be assaulted and causing Moore to be assaulted); *Bistrian*, 696 F.3d at 368 (plaintiff stated failure to protect claim against officials who placed him in a recreation pen with an inmate who knew of his cooperation with prison officials, who had a violent history, and who had previously threated to attack the plaintiff because of his cooperation).

### 2.  Claims Against Dunkin

Cook's claims against Dunkin are based on her imposition of discipline upon him even though she knew he did not receive notice of the disciplinary charges.  "Although pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest in not being detained indefinitely in [restricted housing] without explanation or review of their confinement."  *Stevenson v. Carroll*, 495 F.3d 62, 69 (3d Cir. 2007); *see also Singleton v. Superintendent Camp Hill SCI*, 747 F. App'x 89, 92 (3d Cir. 2018) (*per curiam*).  With respect to pretrial detainees, "the imposition of disciplinary segregation for violation of prison rules and regulations cannot be imposed without providing the due process protections set forth in *Wolff v. McDonnell*, 418 U.S. 539 . . . (1974)."  *Kanu v. Lindsey*, 739 F.

App'x 111, 116 (3d Cir. 2018) (*per curiam*).  Such protections "include the right to receive written notice of the charges at least 24 hours before the hearing, the opportunity to present witnesses and documentary evidence, and a written statement of the reasons for the disciplinary action taken and the supporting evidence."  *Id.* (citing *Wolff*, 418 U.S. at 563-66); *see also Stevenson*, 495 F.3d at 70-71.  Since Cook alleges that Dunkin imposed a disciplinary sanction upon him despite his explanation that he did not receive notice of the charges against him, he may proceed on his due process claim against her.[4]  *See Moore v. Rosa*, No. 21-0933, 2021 WL 1143376, at *4 (E.D. Pa. Mar. 25, 2021) (permitting due process claim to proceed past screening when pretrial detainee alleged that he was disciplined without notice or a hearing).

### 3.  Claims Against John Does #1 and #2

Cook's constitutional claims against John Does #1 and #2, the grievance officers at PICC and RCF, are all predicated on alleged improprieties in how his grievances were handled or alleged obstructions of the grievance process.  (*See* Am. Compl. ¶ 61.)  "[P]risoners do not have a constitutional right to prison grievance procedures."  *Gerholt v. Wetzel*, 858 F. App'x 32, 34 (3d Cir. 2021) (*per curiam*) (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (*per curiam*)).  Accordingly, allegations such as those raised by Cook based on failures of the grievance process or improper handling of or responses to grievances do not give rise to a constitutional claim.  *See Woods v. First Corr. Med. Inc.*, 446 F. App'x 400, 403 (3d Cir. 2011) (*per curiam*) ("We agree with the District Court that

---

[4] Cook suggests that Dunkin's action, which initiated his disciplinary confinement, later allowed for his "continued custody in Administrative Segregation for several months," constituting various constitutional and state torts.  (Am. Compl. ¶¶ 64-65.)  Cook does not, however, allege how Dunkin was personally involved in anything apart from the imposition of the initial 45-day disciplinary sanction, so he has not stated a claim against her based on any other events.  Nor do his allegations support any claims apart from the due process claim discussed above.

because a prisoner has no free-standing constitutional right to an effective grievance process, Woods cannot maintain a constitutional claim against Lucas based upon his perception that she ignored and/or failed to properly investigate his grievances." (internal citation omitted)); *Burnside v. Moser*, 138 F. App'x 414, 416 (3d Cir. 2005) (*per curiam*) (explaining that "[i]nmates do not have a constitutionally protected right to the prison grievance process" and that "a state grievance procedure does not confer any substantive constitutional right upon prison inmates" (internal quotations and citations omitted)).  Furthermore, a prison official's involvement in the grievance process generally does not establish personal involvement in the underlying constitutional violation.  *See Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (*per curiam*) ("The District Court properly determined that Defendants Wenerowicz, Lewis, and Shaylor – who participated only in the denial of Curtis' grievances – lacked the requisite personal involvement [in the conduct at issue]."); *Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (*per curiam*) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews."). Accordingly, the Court will dismiss Cook's claims against John Doe #1 and #2, because they do not allege a constitutional violation.

### 4.  Claims Against Carney, Farrell, and Talmadge

Cook appears to be bringing claims against Carney, Farrell, and Talmadge based on all of the conditions described in his Amended Complaint.  "Suits against high-level government officials must satisfy the general requirements for supervisory liability."  *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017).  There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates."  *Barkes v. First Corr. Med.,*

*Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).  First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)).  This type of liability includes a failure to supervise, however, a plaintiff asserting such a claim must "identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure." *Id.* at 317; *see also Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015).  A supervisor may also "be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Barkes*, 766 F.3d at 316.  "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode*, 845 F.2d at 1207.

Most of Cook's claims against Carney, Farrell, and Talmadge relate to their alleged responsibility for the conditions and/or incidents described in the Amended Complaint because Cook sent them letters and grievances about conditions to which he was subjected and/or posted notices on his cell about those conditions specifically directed to them.  (Am. Compl. ¶¶ 31-32, 37, 59-60, 66-67.)  In other words, the Court understands Cook to be alleging that Carney, Farrell, and Talmadge were personally involved in, and thus liable for, the alleged constitutional

violations of which Cook complained in his correspondence and grievances directed to them that

they may or may not have reviewed.  However, a prison official's participation in the grievance

process, failure to take action in response to a prisoner's letter about the conditions in which he is

confined, or failure to act after becoming aware of an employee's actions, is, without more, an

insufficient basis upon which to base those officials' personal involvement in the underlying

violations.  *See Murray v. McCoy*, No. 23-2582, 2024 WL 1328231, at *3 (3d Cir. Mar. 28,

2024) ("Superintendent Ransom's awareness of Murray's allegations concerning C.O. McCoy,

without more, is insufficient to establish personal involvement" (citing cases)); *Brooks v. Beard*,

167 F. App'x 923, 925 (3d Cir. 2006) (*per curiam*) (defendants' alleged inappropriate responses

to plaintiff's "later-filed grievances" were insufficient to establish those defendants' personal

involvement in underlying wrongs); *Burk v. Crowe*, Civ. A. No. 19-5792, 2020 WL 42758, at *4

(E.D. Pa. Jan. 3, 2020) (plaintiff's "general allegation that he 'wrote to' Crowe, Cassidy, Budd,

and Lagana 'when this happen[ed]' is too vague and undeveloped to state a plausible basis for

liability against these individuals"); *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020)

(evidence that high level official was sent a copy of documents related to prisoner's claim and

official's lack of response did not establish personal involvement, nor did involvement of

officials who only reviewed and denied prisoner's grievances).

      The Court also understands Cook to be raising a claim against Defendants Carney,

Farrell, and Talmadge based on their failure to implement "any noticeable and necessary security

protocols or better training" in response to their alleged awareness that inmates were capable of

"popping out" of their cells, allegedly leading to assaults on inmates and staff.  (Am. Compl. ¶¶

17-18, 36-42.)  In that regard, Cook alleges that "[d]espite frequent-enough inmate-on-inmate

assaults at RCF, neither routine security/maintenance nor cell checks were conducted even

immediately after a violent attack" and that the Defendants "appeared to facilitate a culture of lackadaisical concern" regarding security. (*Id.* ¶ 42.)  Cook does not articulate any specific allegations about prior assaults on inmates or staff, either in dates or frequency, and he does not provide a clear description of the current security protocols at the prison (as best as he can discern).  Further, Cook has failed to allege that Carney, Farrell, and/or Talmadge were aware of and, therefore, deliberately indifferent to the risk posed by the conditions of the cells on the units where Cook was housed.  Although Cook generally alleges that "[u]pon information and belief" these Defendants were so aware of the risk, (*Id.* ¶ 39), he has not supported this speculative allegation with any specific facts supporting an inference of actual knowledge.  Accordingly, Cook has fallen short of alleging a plausible claim against Carney, Farrell, and Talmadge based on a policy or custom theory of liability.[5]  *See Iqbal,* 556 U.S. at 680-81 (concluding claims were not plausibly pled based on conclusory allegations that high level officials "knew of" and "condoned" harsh conditions of confinement "as a matter of policy"); *Argueta v. U.S. Immigr. & Customs Enf't*, 643 F.3d 60, 74 (3d Cir. 2011) (explaining that "broad allegations regarding the existence of a 'culture of lawlessness' are accorded little if any weight" in determining whether a complaint states a claim for supervisory liability); *see also Beers-Capitol*, 256 F.3d at 134 ("[O]ne way — perhaps the easiest way — a plaintiff can make out a supervisor liability claim is

---

[5] Cook's failure to allege a plausible policy or custom is also fatal to his claims against employees of the Philadelphia Department of Prisons in their official capacities because such claims are essentially claims against the City of Philadelphia, which must be based on a municipal policy or custom to survive dismissal.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690, n. 55 (1978)); *Monell*, 436 U.S. at 694 (to plead a basis for municipal liability under § 1983, a plaintiff must allege that the municipality's policy or custom caused the violation of his constitutional rights).

by showing that the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries." (internal quotations omitted)).

### 5.   Claims against John Does #5 and # 6 and Corizon Health

Cook's claims against John Does #5 and #6 and Corizon are based on allegations that these Defendants were deliberately indifferent to his need for medical care.  (Am. Compl. ¶¶ 71-73.)  To state a Fourteenth Amendment claim based on the failure to provide medical care, a pretrial detainee must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs.  *See Farmer*, 511 U.S. at 835; *Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019) (holding that the standard under the Eighth Amendment and Fourteenth Amendment for claims related to a prisoner's medical needs is essentially the same for purposes of the analysis).  "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted).  A serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991).

A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  Deliberate indifference is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical

treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  A private corporation under

contract to provide medical services to a jail, such as Corizon, may be liable under § 1983 if that

entity's policies or customs caused the alleged constitutional violation.  *See Natale v. Camden*

*Cty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003) (acknowledging that entity contracted to

perform medical services for county jail is state actor for purposes of § 1983).  To assert a

plausible § 1983 claim against such an entity, the plaintiff "must identify [the] custom or policy,

and specify what exactly that custom or policy was" to satisfy the pleading standard.  *McTernan*

*v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009) (citation omitted).

The Amended Complaint reflects that Cook was treated for injuries he sustained in the

January 20, 2022 attack.  His deliberate indifference claim is, instead, predicated on his

allegation that despite being told by medical staff that he would be seen daily for follow up and

bandage changes, medical staff did not change his bandages "for a week or more," and then only

after he complained.  (Am. Compl. ¶ 53.)  At the pleading stage, Cook has alleged sufficient

factual matter to proceed on his deliberate indifference claim against Nurse John Doe #6.  He

alleges that although he repeatedly informed the nurse on the unit (understood to be John Doe

#6) that he required a bandage change, the nurse failed to provide that care despite assuring Cook

she would do so, requiring Cook to change the bandages himself, at which point the bandages

had become blood soaked and stuck to Cook's wounds, causing him additional pain.  (*Id*. ¶¶ 53-

55.)  Read liberally, these allegations support an inference that Nurse John Doe #6 was aware of

Cook's need for medical care, *i.e.*, bandage changes prescribed by the medical department for

follow up care, but refused to provide it.  *See Alexander v. Salazar*, No. 19-04138, 2020 WL

8125529, at *1 (C.D. Cal. Mar. 24, 2020) ("[R]efusing to clean a wound or redress bandages for

no good reason, if true, can plausibly amount to deliberate medical indifference"); *Harris v.*

*Hudson Cnty. Jail*, No. 14-6284, 2015 WL 1607703, at *8 (D.N.J. Apr. 8, 2015) (permitting deliberate indifference to serious medical needs claim to proceed past screening where plaintiff was told by doctors that his bandage required daily changing and "the Jane Doe nurse was directly asked to change the bandage, and refused claiming that it was the responsibility of a different nurse"); *see also Cobb v. Ivers*, No. 18-00790, 2020 WL 3618947, at *9 (S.D. Ind. July 2, 2020) (case could proceed to trial on deliberate indifference claim based on a nurse's failure to change bandages where plaintiff "presented evidence showing that blood was leaking out of his bandages on December 5, 2017 and that his foot smelled like rotted flesh on December 20, 2017"). *But see DesRosiers v. Moran*, 949 F.2d 15, 20 (1st Cir. 1991) ("Although it might have been preferable had DesRosiers' dressings invariably been changed by third parties, the departure can scarcely be said to offend accepted standards of decency, indicate obduracy, constitute recklessness in the criminal-law sense, or amount to the wanton infliction of unnecessary pain.").

However, Cook has not alleged any basis for his deliberate indifference claims against Supervisor John Doe #5 or Corizon.  (Am. Compl. ¶¶ 71-72.)  He has not pled any facts describing Supervisor John Doe #5's role, if any, in his follow up care and/or responsibility for the delay in receiving adequate bandage changes.  Since there is no basis from which the Court could infer that Supervisor John Doe #5 was personally involved in the events giving rise to Cook's deliberate indifference to medical needs claim or maintained a policy, practice or custom to deny bandage changes, Cook has not pled a plausible claim against him.  Cook has also failed to plead any basis for a claim against Corizon because nothing in the Amended Complaint alleges that the failure to provide Cook with regular bandage changes was in any way related to a policy or custom of Corizon.  To the contrary, Cook appears to have named Corizon because it

presumably employed nurse John Doe #6, which is not a proper basis upon which to bring a deliberate indifference claim.[6]  The Court will therefore dismiss Cook's deliberate indifference claims against Medical Supervisor John Doe #5 and Corizon.

## IV.   CONCLUSION

For the foregoing reasons, the Court will dismiss Cook's claims with exception of:  (1) his § 1983 claim against MacCallister in his individual capacity for deliberate indifference to his safety and his related intentional infliction of emotional distress claim based on the November 25, 2020 attack at PICC; (2) his § 1983 due process claim against Dunkin in her individual capacity based on her imposition of the 45-day disciplinary sanction against him at PICC; (3) his § 1983 claim against Nurse John Doe #6 for deliberate indifference to his serious medical needs based on the nurse's failure to change Cook's bandages at PICC; and (4) his § 1983 claims against John Doe #3 and John Doe #4 in their individual capacities for deliberate indifference to his safety based on the January 20, 2022 attack at RCF.  The Court will give Cook the option of either filing a second amended complaint in the event he believes he can articulate additional facts that could cure the defects in any of the dismissed claims or, alternatively, proceeding on his remaining claims at this time.  An order follows, which provides additional instructions.

BY THE COURT:

/s/ John Milton Younge
**JOHN M. YOUNGE, J.**

---

[6] Even if Cook had brought a proper claim against Corizon, it appears that any claim may be subject to a stay because on February 20, 2023, Corizon filed a bankruptcy petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas.  *See In re Tehum Care Servs. Inc. fdba Corizon Health Servs., Inc.*, 23-90086 (Bankr. S.D. Tex.); *see also* 11 U.S.C. § 362(a).  Accordingly, if Cook intends to proceed on any claim against Corizon that is subject to the bankruptcy stay, he must file the appropriate documents before the bankruptcy court.