# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMAR M. COOK,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 24-CV-0314** |
| | : | |
| **BLANCHE CARNEY**, *et al*. | : | |
| **Defendants.** | : | |

## MEMORANDUM

**YOUNGE, J.**                                                              **MARCH 28, 2025**

Plaintiff Jamar M. Cook's Second Amended Complaint ("SAC") in this civil action raises claims stemming from his assault by another inmate on November 25, 2020, when he was incarcerated at the Philadelphia Industrial Correctional Center ("PICC"); subsequent disciplinary proceedings that caused Cook to be housed in the Restricted Housing Unit for forty-five days followed by placement in administrative custody; Cook's assault by the same inmate on January 20, 2022 at the Riverside Correctional Facility ("RCF"); and the adequacy of medical care Cook received in the week following the second assault. (ECF No. 25.) Currently before the Court is a Motion to Dismiss filed by all Defendants other than the unidentified and unserved John Doe Defendants, (ECF No. 44), and Cook's Response to that Motion, (ECF No. 46). Also pending is Cook's "Motion for Extension of Time to Serve Defendants." (ECF No. 42.) For the following reasons, the Court will deny the Motion to Dismiss and deny the Motion for Extension without prejudice to Cook's filing of a motion to serve the Doe Defendants if he is able to identify them through discovery.

I.    **FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY**

A.    **The SAC and Prior Pleadings**

Cook initiated this civil action by filing a Complaint pursuant to 42 U.S.C. § 1983 against

Blanche Carney (the former Commissioner of the Philadelphia Prison System), Michell Farrell

(identified as the former Warden of RCF) and two John Doe Correctional Officers employed at

RCF.   (Compl, ECF No. 2.)   Cook alleged that the Defendants violated his constitutional rights

by failing to protect him from an attack by an inmate with whom he had a history, which took

place on January 20, 2022, when Cook was incarcerated at RCF.   (*Id.* at 2.)

After being granted leave to proceed *in forma pauperis*, (ECF No. 13), Cook filed an

Amended Complaint that expanded his claims to include a prior incident and related events that

took place when Cook was incarcerated at PICC and was attacked by the inmate who later

attacked him at RCF.   (Am. Compl., ECF No. 14.)   In a cover letter submitted with his Amended

Complaint, Cook explained that he added these additional claims because, after he filed his

initial Complaint, he "learned that, while a prisoner exhausts his administrative remedies the

Statute of Limitations is tolled for an appropriate period with respect thereto." (*Id.* at 1 (citing

*Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 603 (3d Cir. 2015).)   In a June 26, 2024

Memorandum and Order, the Court screened Cook's Amended Complaint pursuant to 28 U.S.C.

§ 1915(e)(2)(B) and dismissed it in part, but gave Cook leave to file a second amended

complaint if he wanted to replead the dismissed claims.   (ECF Nos 16 & 17.)

After being granted an extension of time, Cook filed his SAC, which is currently the

operative pleading governing the contours of his claims.   *Garrett v. Wexford Health*, 938 F.3d

69, 82 (3d Cir. 2019) (explaining that "the most recently filed amended complaint becomes the

operative pleading").   The SAC names the following Defendants in their individual and official

2

capacities: (1) Carney; (2) Farrell, now identified as the prior Warden of PICC; (3) Cathy Talmadge, identified as the prior Warden of RCF; (4) C.O.IV Dunkin, Hearing Examiner at PICC; (5) C.O.I. McCallister, Correctional Officer at PICC; (6) C.O.I. John Doe #1, Correctional Officer at RCF; (7) C.O.I. John Doe #2, Correctional Officer at RCF; (8) John Doe #3, Medical Supervisor at Philadelphia Prison System; and (9) John Doe #4, Nurse at PICC. (SAC at 1-3.)

Cook alleges that he was regularly housed with violent inmates while he was incarcerated at PICC as a pretrial detainee, despite being a "non-violent offender," and that he observed inmates at PICC could "easily breach their cell doors," allowing them to "exit or enter their own and others' cells at will." (*Id.* ¶¶ 14-17.) On November 25, 2020, at least four inmates approached Cook and his cell mate in the presence of Defendant MacCallister. (*Id.* ¶ 18.) After the leader of the group of inmates "antagonized" Cook's cell mate for having confronted an inmate who allegedly supplied the block with contraband, several inmates attacked Cook's cell mate while one of the inmates attacked Cook. (*Id.* ¶ 19.) Ten or more inmates participated in the attack on Cook and his cell mate, including some who had ostensibly been locked in their cells but "managed to take advantage of the defective locking mechanisms to 'pop out'" and join in the assault. (*Id.* ¶ 20, ¶ 24.)

Cook alleges that he was "privy to several conversations between inmates and correctional staff . . . during which staff expressed how they had communicated either directly or through their union representatives over the years to Carney and Farrell of the dangers posed to staff and inmates by the defective locks," and claims that Carney and Farrell had been "provided City Controller reports, audits, and complaints that described the violence that resulted" from this and other security issues, including deaths, stabbings, and "other violent assaults, many of which were facilitated by inmates ability to breach their cell doors." (*Id.* ¶¶

33-35.)  Cook further alleges that staff and inmates agreed "that the majority of the violence at PICC occurred on what was deemed the '*max side*'" but that Carney and Farrell failed to make a timely effort to replace the locks on that side despite having replaced the locks on the medium side in August 2019.  (*Id.* ¶¶ 36, 38.)  Cook alleges that but for the fact that he was housed with dangerous inmates despite being a non-violent offender and the fact that inmates could "easily breach their cells," he would not have been assaulted at PICC.  (*Id.* ¶ 37.)

Cook also claims that Defendant MacCallister orchestrated the attack because Cook's cell mate's conduct was interfering with MacCallister and other officers' ability to profit from supplying contraband within the facility.  (*Id.* ¶¶ 21-22.)  Although MacCallister was allegedly "present (within a few feet) during the verbal confrontation and ensuing attack" on Cook and his cell mate, he "did nothing to prevent [it], such as order the inmates to disperse, deploy pepper-pray, and/or immediately radio for emergency response assistance."  (*Id.* ¶ 23.)  Cook contends that McCallister finally called for assistance when "the confrontation that he orchestrated exceeded his control."  (*Id.* ¶ 25.)  As a result of the attack, Cook sustained "several injuries, including a busted lip and bruised eye."  (*Id.* ¶ 26.)

Following the assault, several inmates including Cook were "written up" and placed in the Restricted Housing Unit ("RHU") pending a disciplinary hearing.  (*Id.* ¶ 27.)  Cook alleges that he never received notice of the disciplinary infractions with which he was charged and that, when he requested dismissal of the charges on that basis, Defendant Hearing Examiner Dunkin responded "you can take this forty-five days now or I can get you a copy [of the charges] . . . you won't like my mood . . . ."  (*Id.* ¶¶ 28-29.)  Cook accepted the discipline because he feared retaliation.  (*Id.* ¶ 29.)  He alleges that Carney and Farrell were "responsible for reviewing and determining the validity of an inmate[']s disciplinary sanction and/or placement on

administrative segregation status" but, despite being made aware of his circumstances, allowed the discipline and Cook's custody status to stand. (*Id.* ¶ 45.)

While serving his disciplinary sentence in the RHU, Cook did not have access to phone calls or video visits and was also placed in full restraints during recreation consistent with a policy promulgated by Carney and Farrell. (*Id.* ¶ 32.) Cook alleges that he "experienced pain and suffering via the physical pain and discomfort caused by the restraints" as well as emotional distress from the conditions of his confinement. (*Id.*) Upon completion of his sentence, Cook remained in the RHU in administrative segregation in accordance with Dunkin's instruction on the disciplinary sanction. (*Id.* ¶ 31.) He was in the RHU for at least 181 days before he was reviewed for possible release back to general population. (*Id.*)

Cook was transferred to the Detention Center ("DC") in February 2021, allegedly for his safety to ensure that he stayed separate from the inmates who had assaulted him. (*Id.* ¶ 48.) He claims that inmates were able to "easily breach their cell doors" at this facility as well, and that on at least four occasions, he observed inmates leave their cells to assault other inmates. (*Id.* ¶ 49.) Cook filed a grievance about his "safety concerns" and wrote to Carney, after which he claims that an officer briefly chain-locked adjacent cell doors with one another before removing the chains after inmates complained. (*Id.* ¶ 50.)

In June 2021, Cook was transferred to the RHU at RCF. (*Id.* ¶ 51.) He was then placed in general population, where he contends inmates' ability to "pop out" of their cells was "more rampant than he had ever witnessed at PICC and DC combined" because the locks could be manipulated with a thin piece of paper or plastic. (*Id.*) On January 19, 2022, when Cook was housed on E-Unit at RCF, he noticed that several new inmates were placed on the unit, one of whom was the inmate who previously attacked him at PICC. (*Id.* ¶ 52.) He alleges that, in

accordance with governing policy and/or custom, a "separation directive" should have been placed between him and this inmate, that Warden Farrell would have been responsible for issuing that directive, and Warden Talmadge would have been responsible for enforcing the directive upon Cook's transfer to RCF.  (*Id.* ¶¶ 71, 74, 76-78.)

At "the first discreet opportunity" following the inmate's arrival, Cook informed Defendant Correctional Officer John Doe #1 that he was supposed to be kept separate from the inmate due to "a physical confrontation that involved weapons."  (*Id.* ¶ 53.)  John Doe #1 responded, "oh you're Cook. . . you came here from PICC . . . you like being a little snitch-bitch . . . writing grievances . . . write your grievance . . . ."  (*Id.* ¶ 54.)  The officer also refused Cook's request to see a supervising officer.  (*Id.*)  On the 7am to 3pm shift the next morning, Cook approached Correctional Officer John Doe #2 and asked to see a supervising officer because he "had a separation from someone on the unit" and wanted to be moved.  (*Id.* ¶ 56.)  Doe #2 declined to contact a supervisor, "mocked" Cook for "bitching," and told Cook he would have to file a grievance.  (*Id.*)  Cook made the same request of Doe #1 on the next shift but was again mocked for filing grievances.  (*Id.* ¶ 57.)

Shortly thereafter, the inmate who previously attacked Cook at PICC attacked him from behind with a "large jail-made knife" while calling him a "faggot-ass rat."  (*Id.* ¶ 58.)  Cook attributes this assault in part to alleged collusion among Does #1 and #2 and other officers at RCF to make him "a target for violence, abuse and retaliation" by exposing his bisexuality and his efforts to address "illegal contraband operations."  (*Id.* ¶¶ 60-63.)  Cook required fifteen staples to his head to close his wounds.  (*Id.* ¶ 59.)  He sustained permanent scars, trauma, and other injuries including flashbacks, nightmares, headaches, memory lapses, and phantom pain. (*Id.*)

6

Cook claims that Carney and Talmadge were aware of "rampant and serious security breaches at RCF that resulted in numerous violent assaults against inmates." (*Id.* ¶ 64.) He describes an incident in the "final months of 2022" when inmates popped out of their cells to attack another inmate, and an incident when an inmate was stabbed in his neck with a "large jail-made knife." (*Id.* ¶ 65.) Cook also "observed at least ten incidents of assault and extortion at RCF in the several months prior to him being attacked," and claims that staff regularly complained that "policies and customs" implemented by Carney and Talmadge allowed for "rampant violence" that made the facility unsafe. (*Id.* ¶¶ 69-70.) According to Cook, there was an "unwritten policy and custom of *let them kill each other*." (*Id.* ¶ 68 (emphasis in original).)

Cook alleges that after medical staff at RCF treated his stab wounds, he was immediately transferred to the protective custody unit at PICC, "where he was placed in an extremely cold cell without a blanket and without working lights" for several days despite his complaints. (*Id.* ¶ 79.) He claims that, although John Doe #3, the medical supervisor at RCF, told him that he would be seen daily for follow up medical care, including changing his bandages, his bandages were not changed until approximately a week later. (*Id.* ¶ 80.) Cook complained to the nurse John Doe #4, who distributed medication on the unit daily, about his need for new bandages, but although the nurse said she would return to treat him, she did not, leaving Cook to change his blood-soaked bandages himself. (*Id.* ¶¶ 81-82.) Cook alleges that he "endure[d] severe pain and suffering as the bandages stuck to [his] wounds." (*Id.* ¶ 82.) Cook alleges that if John Doe #3, the medical supervisor, had consistently reviewed his chart, he would have learned that Cook had not received the requisite follow up care and could have intervened. (*Id.* ¶¶ 83-84.) Although a deputy conducted bi-weekly reviews of inmates on protective custody status, Cook remained in protective custody until his release on May 12, 2022. (*Id.* ¶ 85.)

Cook alleges that he filed grievances about these issues, including the two attacks, but that he never received a response to his grievances, other than those related to issues he experienced with commissary. (*Id.* ¶¶ 87-91.) He brings assorted constitutional claims pursuant to 42 U.S.C. § 1983, and related claims under state law, (*id.* ¶¶ 92-146), and seeks damages, (*id.* ¶¶ 147-54).

### B.    Service and Motion to Dismiss

Initial attempts to serve the SAC on the non-Doe Defendants pursuant to 28 U.S.C. § 1915(d) and Federal Rule of Civil Procedure 4(c)(3) were unsuccessful. (*See* ECF No. 30 & 31.) Accordingly, in an effort to satisfy its service obligation in this *in forma pauperis* case, the Court added the City of Philadelphia to the docket for purposes of service and directed service on the City, because the SAC asserts claims against the Defendants in their official capacities, which are effectively claims against the City itself. (*See* ECF No. 32 at ¶ 1 & n. 2 (citing SAC at 3, ¶ 13 and *Wyatt v. Municipality of Commonwealth of Philadelphia*, 718 F. App'x 102, 103-03 (3d Cir. 2017) (*per curiam*)).) Counsel for the City of Philadelphia subsequently entered an appearance for the City, as well as for Defendants Carney, Farrell, Talmadge, Dunkin, and MacCallister (the "Moving Defendants"), when Counsel filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), seeking to dismiss the claims against those Defendants for failure to state a claim. (ECF No. 44); *see also* Local Rule 5.1(a) (stating that the filing of a motion "shall be deemed an entry of appearance").

The Motion to Dismiss asserts two arguments. First, the Moving Defendants argue that the claims against them arising out of the November 25, 2020 incident and subsequent disciplinary hearings and related confinement are barred by the two-year statute of limitations, which they assert resolves all claims against Defendants MacCallister and Dunkin. (ECF No. 44

8

at 4-5.)  Second, the Moving Defendants argue that the Court should dismiss all supervisory liability claims against Defendants Carney, Farrell and Talmadge because Cook's "allegations against these supervisory officials in the SAC remain substantively the same" as those in the Amended Complaint, which the Court previously dismissed.  (*Id.* at 6.)

In response, Cook argues that his claims are not time-barred because the statute of limitations was tolled while he exhausted administrative remedies as required by the Prison Litigation Reform Act ("PLRA").  (ECF No. 46 at 4.)  Since he did not receive a response to his grievances, Cook claims that he is entitled to tolling from the date he filed his first grievance—on or about December 7, 2020—through his release on May 13, 2022 or, at a minimum, through May 6, 2022 when he "submitted his final appeals relating to each incident."  (*Id.* at 4-5.)  Cook also argues that he has stated plausible claims for supervisory liability because he cured the defects in his Amended Complaint by adding allegations about "each supervisor's personal involvement, directives and deliberate indifference with particularity."  (*Id.* at 5.)  The moving Defendants did not file a reply despite having been given permission to do so.  (*See* ECF No. 45.)

### C.    Cook's Motion for Extension of Time

Before the Motion to Dismiss was filed, Cook filed a Motion for Extension of Time to Serve the Defendants.  (ECF No. 42.)  That Motion seeks additional time for Cook to serve the Defendants and describes Cook's efforts to obtain information from the City that would enable him to provide addresses for service.  (*Id.*)   However, service is no longer an issue as to Defendants Carney, Farrell, Talmadge, Dunkin, and MacCallister due to counsel's subsequent filing of the Rule 12(b)(6) Motion on behalf of those Defendants.  The Doe Defendants, however, remain unidentified and, therefore, unserved.  In that regard, an exhibit attached to

Cook's Motion reflects that he sought the following information from the City for the purpose of identifying the Doe Defendants:

> a. The full name and badge number of the male corrections officer who was stationed at Riverside Correctional Facility ("RCF") on E Unit during January 19, 2022 – January 20, 2022, first shift (7AM-3PM).  Plaintiff recalls this individual as being an apparently [B]lack male;

> b. The full name and badge number of the male corrections officer who was stationed at RCF on E Unit during January 18, 2022 – January 20, 2022, second shift (3PM-11PM).  Plaintiff recalls this individual as being an apparently Italian or Hispanic-American;

> c. The full name of the attending physician and/or Physician's Assistant (or other title) who responded to Plaintiff's injuries on or about January 20, 2022, after 7PM at RCF.  Plaintiff recalls this individual as being an apparently Caucasian female;

> d. The full name and title of the nurse assigned to distribute medication on the Protective Custody Unit during first shift at PICC.  Plaintiff recalls this individual as being an apparently [B]lack female.

(ECF No. 42 at 7.)  Cook asserts that his request for this information from the City was denied.

(*Id*. at 1, 10.)  None of the Defendants responded to Cook's Motion in this Court.

## II.    STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555.)

10

"Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  It is the defendants' burden to show that a complaint fails to state a claim.  *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).  To determine whether a complaint filed by a *pro* se litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and ask only whether that complaint, liberally construed contains facts sufficient to state a plausible claim.  *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally).

## III.    DISCUSSION

### A.  Statute of Limitations

Pennsylvania's two-year statute of limitations applies to Cook's claims.  *See* 42 Pa. Cons. Stat. § 5524; *Wallace v. Kato*, 549 U.S. 384, 387 (2007).  A claim accrues "when a plaintiff has a complete and present cause of action, that is, when [he] can file suit and obtain relief."  *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010) (quotations omitted).  In general, this means that the statute of limitations will start running at the time the plaintiff "knew or should have known of the injury upon which [his] action is based."  *Sameric Corp. of Del., Inc. v. City of*

*Phila.*, 142 F.3d 582, 599 (3d Cir. 1998).  However, "the PLRA is a statutory prohibition that tolls Pennsylvania's statute of limitations while a prisoner exhausts administrative remedies." *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 603 (3d Cir. 2015).  Pursuant to the prison mailbox rule, a prisoner's complaint is considered filed at the time he hands it over to prison authorities for forwarding to the Court.  *See Houston v. Lack*, 487 U.S. 266, 276 (1988).

A "limitations defense . . . [may] be raised by a motion under Rule 12(b)(6) only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations."  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quotations omitted).  But dismissal is only appropriate if the time bar is apparent on the face of the complaint.  *Id.*  Additionally, a plaintiff is not obligated to "plead around an affirmative defense in his complaint."  *Id.* at 252.  In that regard, "while a court may entertain a motion to dismiss on statute of limitations grounds, it may not allocate the burden of invoking equitable tolling in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense."  *Wiggins v. Albert Einstein Med. Ctr.*, No. 20-3129, 2022 WL 1197015, at *2 (3d Cir. Apr. 22, 2022) (alteration and footnote omitted).

Although the events that occurred at PICC took place more than two years before Cook filed this lawsuit, it is not apparent from the face of the SAC that these claims are time-barred in light of the tolling to which Cook is entitled during the administrative exhaustion process.  Cook alleges in his SAC that he attempted to exhaust administrative remedies but that he did not receive a response to his grievances and that he filed appeals "not knowing any other recourse." (SAC ¶¶ 87-91.)  He further argues, in his Response to the Motion to Dismiss, that his claims based on events that occurred at PICC are timely because the limitations period was tolled while

he attempted to exhaust administrative remedies. (ECF No. 46 at 4.) The Moving Defendants did not respond to this argument, nor did they address tolling or administrative exhaustion in their Motion. Since "a liberal construction of [Cook's] allegations" and the arguments in his Response raise an issue as to whether tolling applies, the Court will not dismiss his PICC-related claims as time-barred. *Herrera v. Agents of Pennsylvania Bd. of Prob. & Parole*, --- F.4th ---, No. 23-1123, 2025 WL 810242, at *5 (3d Cir. Mar. 14, 2025) (remanding to permit *pro se* litigant to address tolling where litigant alleged that tolling applied even though the complaint suggested his claims may have been untimely).

### B. Supervisory Liability

The Moving Defendants also argue that the supervisory liability claims against Defendants Carney, Farrell, and Talmadge must be dismissed because Cook's "allegations against these supervisory officials in the SAC remain substantively the same" as those the Court dismissed when screening his Amended Complaint. (ECF No. 44 at 6.) This argument fails to appreciate or address the detailed allegations in the SAC that Cook added to his most recent pleading. (*Compare* ECF No. 14 ¶¶ 18, 31-32, 39-42, 59-60, 66 *with* ECF No. 25 ¶¶ 33-47, 64-78, 99-103, 115-119, 130-136.) Accordingly, the Moving Defendants have not carried the burden on their Motion.

**IV.     CONCLUSION**

For the foregoing reasons, the Court will deny the Motion to Dismiss and direct the Moving Defendants to answer the SAC.  Since this case will proceed to discovery, the Court will deny Cook's pending motion without prejudice to him proceeding with discovery to learn the names of the Doe Defendants in the expectation that they can be identified and served.

**BY THE COURT:**

**/s/ John Milton Younge**

_____

**JOHN MILTON YOUNGE, J.**